# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN KUGLER, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 8305 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| BOARD OF EDUCATION OF THE | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Kugler ("Kugler") brought this action against the Board of Education of the City of Chicago ("Board"), alleging that the Board, by imposing a set of restrictions on his access to Chicago Public Schools (CPS) property, retaliated against him for speech protected under the First Amendment and otherwise violated his First Amendment rights. He now moves for a preliminary injunction setting aside the restrictions. The Court held a two-day hearing on Kugler's motion. For the reasons that follow, Kugler's motion for a preliminary injunction [6] is granted in part and denied in part.

## Background

John Kugler is a field representative for the Chicago Teacher's Union (CTU) and a parent of two children who attend Benito Juarez Community Academy ("Juarez Academy"), a CPS school. Prelim. Inj. Hr'g Tr., Nov. 21, 2016, at 7:9–10; 44:13, ECF No. 54. He has served as a CTU field representative since 2010. *Id.* at 6:25–7:1. He has been an outspoken critic of CPS policies, frequently writing online

articles in blogs such as Substance News and Daily Kos. *See generally id.* at 57:1–59:25. As a CTU field representative, he frequently participates in the grievance process by representing teachers who are members of the union. *Id.* at 9:2–7. As part of this process, Kugler has met with principals and teachers at various CPS schools and participated in grievance hearings and disciplinary meetings with hearing officers at the Board's offices. *Id.* at 9:2–7, 10:25–11:12. In his capacity as a CTU field representative, Kugler prides himself on serving as a strong-willed advocate for teachers. *See id.* at 10:4–24.

Recently, however, Kugler engaged in several actions as a union representative and CPS critic that prompted the response from the Board giving rise to the controversy in this case.[1] First, in December 2014, Kugler participated in a grievance hearing at Manley Career Academy ("Manley") at which Principal Trista Harper ("Harper") was present. *See generally id.* at 21:14–22:15; 86:17–89:12. During the course of the hearing, Kugler yelled at Harper and exhibited what she considered to be an intimidating tone and body language. *Id.* at 87:9–19. When Harper asked him to act professionally and look at her when speaking to her, Kugler replied, "I don't have to look at you," and asked, "I mean, who are you?" *Id.* at 87:24–88:3. He then banged his fist on a desk and said, "What are you going to do about it?" *Id.* at 88:6–8. Harper, who was upset and felt threatened, "thought at the time maybe [she] should get security because [she] thought that maybe

---

[1]     Based on Kugler's testimony and the representations in his briefing, the Court does not understand Kugler to dispute the incidents summarized herein. *See, e.g.*, *id.* at 22:14–15, 22:20–21, 24:6–10, 29:9, 31:18–19, 32:11–23; 71:11–23; 76:3–4, 77:17–21.

[Kugler] . . . wanted to fight or something," having never experienced such conduct in a professional setting. *Id.* at 88:13–15, 89:1–10. She reported Kugler's conduct to the Board's law department. *Id.* at 88:23–24. Following the meeting, she "started to receive an abundance of email harassments" from Kugler. *Id.* at 89:20–22.

In September 2015, Kugler represented another Manley teacher at a grievance hearing at one of the Board's offices. *See generally id.* at 22:16–28:22, 90:15–91:24. Harper participated by phone. *Id.* at 91:1. During the hearing, Kugler interrupted Harper while she was speaking and said that he did not have to respect her. *Id.* at 91:4–14. He then began yelling and screaming at a hearing officer. *Id.* at 91:15–16. Unable to calm Kugler, the hearing officer was forced to conclude the hearing. *Id.* at 91:20–24.

Kugler's disruptive conduct at grievance hearings continued. In March 2016, Kugler attended a grievance hearing at one of the Board's offices in which he screamed and yelled at Amanda Smith, a CPS project manager who participated in grievance hearings. *See generally id.* at 111:13–25, 114:7–118:19. During the course of the meeting, Kugler raised his hand toward her and pointed at her face, *id.* at 115:8–9, told her to "shut up," *id.* at 32:12, and insisted she did not have to speak*, id.* at 115:11–12. Smith felt intimidated and "did not know how far he would take it" or "what he would say or do next." *Id.* at 115:14, 116:13–14. When she approached Kugler after the meeting to ask him not to speak to her as he did in the future, Kugler "went off" and began screaming, banging on a desk, and yelling. *Id.* at 116:17–18, 117:2–3. "[S]haking" and unsure what Kugler would do next, Smith

left the room to prevent the situation from escalating further. *Id.* at 117:7–9, 117:23–25.

Following the March 2016 hearing, the Board and the CTU communicated with each other about Kugler's conduct and agreed on several steps toward remedying it, but they were unable to reach a final solution. *See generally* Prelim. Inj. Hr'g Tr., Nov. 22, 2016, Vol. 2B, at 321:25–328:13, ECF No. 56. The Board discussed two options with the CTU: requiring another CTU representative to accompany Kugler to grievance hearings, *id.* at 323:12–18, and providing Kugler a "last-chance agreement" to give him a final opportunity to change his behavior, *id.* at 323:19–25. The CTU evidently had a "negative" reaction to the first option, suggesting that "it was too expensive . . . for [it] to do that, even for a brief period of time." *Id.* at 323:15–18. Later, however, the CTU did not object to the requirement that Kugler be accompanied by someone for a specific hearing. *Id.* at 328:10–13. With respect to the second option, the CTU rejected the Board's suggestion, saying "they would not be a party" to any last-chance agreement. *Id.* at 326:16–18.

In the meantime, on April 28, 2016, Kugler sent an email that played a large role in the Board's decision to impose the restrictions at issue in this case. The email, which was addressed to Thomas Smith, CPS's Director of Sports Administration, concerned the swimming pool at Juarez Academy. Pl.'s Mem. Supp. Prelim. Inj., Ex. F, ECF No. 57. This email was the culmination of a series of emails and efforts by Kugler to draw attention to the school's broken pool. Hr'g. Tr., Nov. 21, at 44:7–20. Kugler, whose children were on the school's swim and water

polo teams, was concerned that CPS officials were not making a sufficient effort to repair the pool. *Id.* at 44:13–14, 45:3–6. In the email, Kugler accused CPS of "active sabotage." Pl.'s Mem., Ex. F. He expressed frustration with CPS's efforts and the answers he had received to his other attempts to bring attention to the problem. *Id.* Then, at the conclusion of the email, Kugler issued an ultimatum: "If you think this is a joke and continue to give me bureaucratic answers[,] see what happens tomorrow at noon if this is not fixed by then." *Id.*

Smith perceived the email as "threatening" and forwarded it to Joseph Moriarty, a CPS labor officer. Pl.'s Mem., Ex. D. Moriarty in turn forwarded the email to Jadine Chao, the Board's Chief of Safety and Security. *Id.* Chao considered the email to contain a threat of an open-ended nature. Hr'g Tr., Nov. 21, at 131:4–5. Reflecting on the email, she explained that "[w]hen we saw that open-ended threat, we [had] to take a precaution and assume that threat might mean safety—a safety risk to the school or to an individual." *Id.* at 131:5–7. She considered the email to be "very threatening, unlike typical standard emails that [she had] seen from other parents who are frustrated, [and] unlike other typical emails that [she'd] even seen from Dr. Kugler himself." *Id.* at 132:7–10. To that end, she noted that, whereas Kugler had on other occasions specifically told the Board he intended to go to the press if the Board did not address his various concerns, he did not do so here, which increased her level of concern. *Id.* at 134:16–17. Board General Counsel Ronald Marmer concurred that the email contained a threat of violence. Prelim. Inj. Hr'g Tr., Nov. 22, 2016, Vol. 2A, at 227:24–229:4,

ECF No. 55.  In his view, "the gist of the email was to say that if things weren't done by a certain time, events would unfold.  And the plain implication of that language was that it could be a violent encounter."  *Id.* at 228:6–9.

Later, after contacting the CTU, Board officials learned that Kugler's true intention was to hold a press conference if the pool was not fixed by noon on the following day.  *Id.* at 263:15–18, 291:4–7.  Reflecting on his purpose in sending the email, Kugler testified that he intended to give Smith a "deadline" and wrote the email as he did so that it would be taken seriously.  Hr'g Tr., Nov. 21, at 48:18–20, 52:3–13.  He also stated that he "was planning on having a news conference" the next day if the pool was not fixed.  *Id.* at 51:15–17.  The email did not, however, mention a news conference, and Chao, upon receiving it, instituted the Board's safety response plan.  *Id.* at 167:8–16.

Shortly thereafter, in May 2016, the Board imposed restrictions on Kugler's access to Board property.  These restrictions are the subject of Kugler's case before this Court.  Marmer testified that the restrictions were put in place after considering Kugler's conduct at grievance hearings, the Juarez Academy pool email, Kugler's frequent use of FOIA requests,[2] and his criminal history.[3]  *Id.* at 218:14–

---

[2]     Marmer explained that the frequency of Kugler's FOIA requests over a short period of time suggested to him that Kugler "was more interested in acting out than obtaining information and [might] be losing some degree of control."  Hr'g Tr., Nov. 22, Vol. 2A, at 232:7–19.

[3]     Marmer "understood that [Kugler] had a conviction for aggravated battery, that the circumstances surrounding that conviction involved a violent act involving a blunt instrument of some kind, and that the aggravated battery conviction itself might have been the result of a plea agreement bargain down from some more serious charges."  *Id.* at 234:11–16.

21.     The letter imposing the restrictions begins by stating that Kugler has "displayed a pattern of ongoing actions that is not only disruptive, but also threatening in nature." Pl.'s Mem., Ex. A. It then recounts the incidents described above, characterizing them as "some examples of serious incidents that no longer can be tolerated." *Id.* The letter further states that Kugler's "outbursts are violent, unpredictable, and appear unmanaged. They leave CPS staff feeling physically unsafe and threatened." *Id.* In light of this behavior, the letter then bars Kugler from entering any CPS office or school building or coming onto CPS grounds. *Id.* It grants two exceptions: (1) Kugler can go to his children's school events after first seeking permission from school officials; and (2) Kugler can attend meetings in accordance with the Illinois Open Meetings Act, but he must first notify Board officials that he will attend. *Id.* The letter warns that if Kugler enters CPS property in violation of the restrictions or acts uncivilly on CPS property, he will be directed to leave, and police will be summoned. *Id.*

        The letter also initially barred Kugler from contacting CPS employees directly, requiring that "[a]ll CPS email correspondence [ ] be sent to email address: Kugler-inbox@cps.edu." *Id.* The Board later clarified that he was free to email CPS employees that he represents directly, but any emails to CPS administrators should be sent to Kugler-inbox@cps.edu. Def.'s Prelim. Inj. Hr'g Ex. 22.[4]

---

[4]     The letter containing this clarification was admitted as an exhibit at the evidentiary hearing, but not included in the parties' post-hearing briefing. The letter can be found on the docket as an exhibit to Plaintiff's complaint. *See* Compl., Ex. B, ECF No. 1.

According to Marmer, the restrictions are in effect for an indefinite duration. *See generally* Hr'g Tr., Nov. 22, Vol. 2A, at 279:14–280:7. Marmer explained, however, that the restrictions might be lifted under certain conditions if Kugler demonstrated a pattern of more appropriate behavior during grievance hearings conducted by phone or video conference. *Id.* at 278:15–25.

As to the effect of these regulations, Kugler testified that they have severely impeded his ability to associate with teachers as part of his union duties and deprived him of the ability to participate in certain grievance hearings. Hr'g Tr., Nov. 21, at 63:3–9, 67:4–68:8. He acknowledged that he is not prevented from attending board meetings or his children's events, Hr'g Tr., Nov. 22, Vol. 2A, at 204:7–25, and that he is still able to participate in grievance hearings by phone or video and meet with CTU members, so long as the meeting is not at school or on CPS property, *id.* at 206:1–13. He has since supplemented the record by providing examples of the Board preventing him "from representing a number of CTU members at hearings of various types." Pl.'s Mot. Supplement Record ¶ 5, ECF No. 66. In two such meetings, Kugler sought to represent teachers at disciplinary hearings at the CTU's office or by videoconference, but was told he could not do so. *See id.*, Exs. 1–2.[5]

---

[5]     In a response to Kugler's motion to supplement, the Board observes that discipline meetings differ from grievance hearings, "which were the kind of hearing that has been the focus of the lawsuit through the evidentiary hearing." Def.'s Resp. Mot. Supplement Record 2, ECF No. 69. The Board further notes that "the Board recently submitted to the CTU for review and comment proposed protocols for videoconferencing in discipline meetings. These protocols, which affect all CTU Field Representatives, take time to develop." *Id.* (emphasis omitted). As for grievance hearings, the Board represents that Kugler has attended twenty-six such hearings by videoconference. *Id.* at 4.

## Legal Standard

A preliminary injunction is a unique and powerful remedy that courts grant only where the circumstances of a case clearly demand it. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008). Thus, the party seeking a preliminary injunction bears the burden of persuading the court, by a clear showing, that a preliminary injunction is warranted. *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005). To determine whether to issue a preliminary injunction, the court engages in a two-phase analysis. Under the threshold phase, the party seeking a preliminary injunction must make three showings: first, that it will suffer irreparable harm without the injunction in the period prior to final resolution of its claims; second, that traditional legal remedies are inadequate; and third, that it has some likelihood of succeeding on the merits. *Girl Scouts*, 549 F.3d at 1086. If the movant does not make all three showings, the court must deny the preliminary injunction. *Id.* But if the movant makes all three, the court proceeds to the second, balancing phase, in which "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.*

<u>**Analysis**</u>

## I.     Likelihood of Success on the Merits

The Court begins its analysis with evaluating Kugler's likelihood of success on the merits. This factor is often determinative in First Amendment cases, because "'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859, 867 (7th Cir. 2006). Additionally, "the 'quantification of injury is difficult and damages are therefore not an adequate remedy.'" *ACLU of Ill.*, 679 F.3d at 589 (quoting *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982)); *accord Christian Legal Soc'y*, 679 F.3d at 859, 867. As such, here, Kugler's likelihood of success on the merits is in some respects the whole ball game. In evaluating Kugler's probability of success, the Court must determine whether his chances of prevailing are better than negligible. *Girl Scouts*, 549 F.3d at 1096.

Kugler's complaint pleads four counts: "Retaliation," "Denial of Freedom to Associate and Assemble," "Denial of Access to Public Forum," and "Petition for Grievances." Compl. 9–12. His briefing focuses almost solely on his retaliation claim, the first element of which requires the plaintiff to show he engaged in activity that is protected by the First Amendment. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Regardless of the theory on which he relies, however, "[i]n

order to prevail in a First Amendment case, the plaintiff must first show that protected speech is being restricted." *Goodman*, 430 F.3d at 438.

Kugler contends that the activities described in the Board's letter imposing restrictions on him are protected under the First Amendment. He also argues that the letter is merely pretext, and that the Board's restrictions are based on his repeated criticism of the Board. The Board, for its part, maintains that Kugler's conduct is not protected by the First Amendment, and that it is within its rights to bar him from CPS property.

### A.    April 28, 2016 Email

As an initial matter, the Court is persuaded that Kugler's April 28, 2016 email constituted a true threat and thus is not speech protected under the First Amendment. True threats are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). They are categorically excluded from First Amendment protection. *See id.* at 359–60. Traditionally, the Seventh Circuit has used two objective standards to ascertain whether a statement constitutes a true threat. *United States v. Parr*, 545 F.3d 491, 499 (7th Cir. 2008). The "reasonable speaker" test "asks whether a reasonable speaker would understand that his statement would be interpreted as a threat." *Id.* Conversely, the "reasonable listener" test asks "whether a reasonable listener would interpret the statement as a threat." *Id.* In applying these standards, a court focuses on the reasonable speaker test, but conclusions from the

reasonable listener test—*i.e.*, the listener's belief and response—are relevant evidence. *See United States v. Saunders*, 166 F.3d 907, 913 (7th Cir. 1999).

In his reply, Kugler argues that a subjective standard applies in determining whether his April 2016 email constituted a true threat. Kugler relies on *Virginia v. Black*, highlighting the Supreme Court's language that a true threat requires that the speaker "'means to communicate a serious expression of an intent to commit an unlawful act of unlawful violence.'" Pl.'s Reply 3, ECF No. 65 (quoting *Black*, 538 U.S. at 359); *see also id.* at 9. According to Kugler, because he did not intend to communicate a serious intent to commit an unlawful act of violence, his statement cannot constitute a true threat. *Id.* at 4.

But this argument is incorrect for several reasons. First, Kugler reads too much into the Supreme Court's phrasing in *Black*. There, the Court clearly stated that a speaker must intend to make a statement that contains a threatening expression, but did not unambiguously hold that the speaker must also subjectively intend that the expression be perceived as threatening. *See United States v. Jeffries*, 692 F.3d 473, 479–80 (6th Cir. 2012), *abrogated on other grounds by Elonis v. United States*, 135 S. Ct. 2001 (2015). And while the Seventh Circuit in *Parr* noted that *Black* may have cast some doubt on the use of a wholly objective standard, the court declined to reach the issue. 545 F.3d at 500. A majority of courts that have reached the issue in the wake of *Black*, however, have nevertheless applied an objective test in assessing true threats. *United States v. Haddad*, No. 09 CR 115, 2014 WL 1493152, at *3 (N.D. Ill. Apr. 16, 2014) (collecting cases). This

follows from the Supreme Court's rationale in *Black* that "the purpose of the prohibition on true threats is to 'protect individuals from the *fear* of violence' and 'from the disruption that *fear* engenders.'" *Id.* (quoting *Black*, 538 U.S. at 360). Shifting the focus of the analysis to whether the speaker subjectively intended for a statement to be perceived as a threat would provide inadequate protection for listeners, who must take threats seriously, particularly in this age of mass violence. Accordingly, the Court applies the reasonable speaker test, as informed by the reasonable listener test, in determining whether Kugler's April 2016 email constituted a "true threat."

Here, a reasonable speaker would understand that listeners would interpret the relevant portion of Kugler's email—"see what happens tomorrow at noon if this is not fixed by then"—as a threat of violence. Kugler's ultimatum was phrased in vague, provocative language,[6] and accused the Board of "active sabotage." A reasonable author of such an email would expect recipients to fear potential violence. Additionally, as the final email in a series of complaints, the recipients were left reading the email with the knowledge that Kugler had grown increasingly angry and dissatisfied with how his complaints had been handled. A reasonable author in Kugler's position, therefore, would expect that using vague language like "see what happens tomorrow at noon" would lead readers to suspect that Kugler— frustrated that words were getting him nowhere—intended to escalate his actions.

---

[6]     Kugler asserts that "open-ended" threats cannot be true threats, Reply at 9, but provides no support for this proposition and fails to account for the possibility that open-ended threats are more threatening because of the greater range of fear they can instill.

This is especially true when one considers the Board's past experiences with Kugler and his criminal history, even if far removed. *See Parr*, 545 U.S. at 501 ("[I]n a threat case, information about the defendant's background is at least potentially relevant to gauging whether his statements qualify as a true threat.").

The reasonable listener test provides further support for the conclusion that Kugler's email constituted a true threat. For the reasons explained above, a reasonable listener in Chou's position would interpret the open-ended nature of Kugler's ultimatum as presenting the possibility of violence. Additionally, given her general familiarity with parent emails, as well as Kugler's past emails, Hr'g Tr., Nov. 21, at 132:7–10, and the fact that Kugler did not specifically mention the press despite having done so previously, *id.* at 134:16–17, it would be reasonable for a person in her position to conclude that Kugler was threatening to do more than conduct a press conference. And, most importantly, reasonable people in Chou's and Marmer's positions, tasked with keeping students safe, would interpret the email as threatening and take appropriate action.

For the sake of completeness, the Court also notes that, based on Kugler's testimony at the preliminary injunction hearing, it is persuaded that he subjectively intended for the email to convey a serious threat of violence. While Kugler stated his intent was only to signal that he might go to the press, Hr'g Tr., Nov. 21, at 51:15–17, he offered no reason why he did not simply state that intention in his email, when he had threatened going to the press so many times before. The only plausible inference is that he wanted the recipient to believe he might do more. His

efforts were successful. Accordingly, to the extent Kugler's claims are premised on his April 2016 email, the Court finds that they have a less than negligible likelihood of success on the merits, because his statements in the email were not protected speech sufficient to support a First Amendment claim.

## B. Kugler's Other Conduct

While Kugler's email precipitated the Board's letter, it is clear that the restrictions the Board placed on Kugler also were in response to Kugler's intimidating and unprofessional conduct during grievance hearings that preceded the April 2016 email. Pl.'s Mem., Ex. A. Thus, to the extent that the Board's restrictions were based upon these incidents, whether Kugler has any likelihood of succeeding on his claims depends upon whether the Board can exclude Kugler from CPS property indefinitely as a consequence of his uncontrolled behavior.

As a preliminary matter, the Court is mindful that "no mandate in our Constitution leaves States and governmental units powerless to pass laws to protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of spots selected by the people . . . for public and other buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools, and hospitals." *Carey v. Brown*, 447 U.S. 455, 470–71 (1980) (quoting *Gregory v. Chicago*, 394 U.S. 111, 118 (1969) (Black, J., concurring)). In his reply brief, Kugler concedes that he "does not claim a substantive right to enter Board property as a constitutional matter," instead contending that he has been retaliated against in response to protected speech, which he believes he should be able to

express on CPS property. Reply at 4. Conversely, however, in Count III of his complaint, Kugler alleges that the Board has deprived him "of his right to [access] a limited public forum, namely, that school property which the Board has opened up for grievance hearings in which CTU members like plaintiff can criticize the Board for its policies and actions." Compl. ¶ 67. Whether styled as a retaliation claim or as a denial of access claim, the central question is whether the First Amendment prohibits the Board from banning Kugler from CPS property altogether and for an unspecified duration. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985) ("Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.").

The Court begins, therefore, by discussing Kugler's likelihood of success on the merits with regard to his denial of access claim, and then turns to his retaliation claim.

### 1. Denial of Access Claim

In his complaint, Kugler alleges that the Board has created a limited public forum in the meeting rooms in which it holds grievance hearings, and that the Board's restrictions violate his First Amendment right to participate in those hearings. The Board appears to take the position that it can exclude Kugler from CPS property because it constitutes a nonpublic forum. Def.'s Resp. at 11 (citing

16

*Vukadinovich v. Bd. of Sch. Trs. of Mich. City Area Schs.*, 978 F.2d 403, 409 (7th Cir. 1992)), ECF No. 61.

First Amendment doctrine teaches that there are four types of fora: the traditional public forum, designated public forum, limited public forum, and nonpublic forum. *Cornelius*, 473 U.S. at 802–04; *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015). Traditional public fora "'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). In such fora, "the rights of the state to limit expressive activity are sharply circumscribed"; time, place, and manner restrictions must be content-neutral, narrowly tailored to serve a significant governmental interest, and permissive of ample alternative channels of communication. *Id.* Similarly, in a designated public forum, where "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose," restrictions on speech are "subject to the same strict scrutiny." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469–70 (2009).

In a limited public forum or nonpublic forum, however, the state has a much broader ability to restrict speech. A nonpublic forum is government property that has not been dedicated to First Amendment activity, and in which the government "act[s] as a proprietor, managing its internal operations." *Int'l Soc'y for Krishna*

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). In a limited public forum, the government reserves the forum "for certain groups or for the discussion of certain topics." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). In limited and nonpublic fora, the state "may legally preserve the property under its control for the use to which it is dedicated." *Id.* (quoting *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390 (1993)). To that end, the state possesses "the right to make distinctions in access on the basis of subject matter and speaker identity." *Perry*, 460 U.S. at 49. That said, "[o]nce it has opened a limited forum, [ ] the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Rosenberger*, 515 U.S. at 829 (internal quotation marks and citations omitted).

Here, the Court must first define the relevant forum, and then determine its classification. *Cornelius*, 473 U.S. at 800. The Court defines the forum by looking to "the access sought by the speaker." *Id.* at 801. Here, Kugler appears to seek access not to any piece of CPS property, but to meeting rooms used for grievance hearings at CPS schools and CPS's offices.[7] Thus, the relevant forum is a CPS meeting room in which a grievance hearing is held.

---

[7] There are three additional fora at issue in this case: Juarez Academy, rooms used for public meetings on CPS grounds, and CPS administrators' email inboxes. Kugler provides no argument in relation to the restrictions on his access to these fora in his briefing, which focuses exclusively on his participation in grievance hearings and disciplinary meetings. The Court therefore declines to address them. *Home Care Providers, Inc. v. Hemmelgarn*, 861 F.3d 615, 625 (7th Cir. 2017) (holding that undeveloped arguments without discussion

The question, then, is how to classify such rooms. The Board argues that all CPS property must be treated as nonpublic fora, without much support or analysis. On the other hand, Kugler maintains that the meeting rooms in which grievance hearings are conducted constitute limited public fora for purposes of First Amendment analysis. Compl. ¶ 67. Although Kugler has the better of this argument (given that CPS has opened these rooms to CTU representatives for the purpose of conducting such hearings), this distinction matters little, because the same standard applies to evaluating the Board's action in either case. CPS is permitted wide latitude in preserving meeting rooms for the purpose for which they are reserved, and may restrict both the content of speech and speaker identity. *Rosenberger*, 515 U.S. at 829. Its restrictions, however, must nevertheless be reasonable, and must not discriminate on the basis of viewpoint. *Id.*

The issue, therefore, is whether the Board's efforts to ban Kugler from CPS meeting rooms indefinitely, without any established mechanism for lifting the ban, is a reasonable restriction on his speech. A restriction "must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809. The Court must consider the governmental interest at issue, as well as the nature and function of the relevant forum. *United States v. Kokinda*, 497 U.S. 720, 732 (1990). Ultimately, a restriction "need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808 (emphasis omitted). Moreover, in this context, the ban need not be narrowly

---

or citation to authority are waived). To the extent he seeks a preliminary injunction in relation to these restrictions, his motion is denied.

tailored to the government interest, nor must the government's interest be compelling. *Id.* at 809.

CPS property is, by all accounts, devoted to the mission of education. It is undisputed, however, that in furtherance of that mission, the Board and its employees have opened up various meeting rooms at CPS's campuses and offices for the purpose of holding grievance hearings and disciplinary meetings with teachers and their CTU representatives. Thus, while the Board has a significant interest in protecting its employees and maintaining a safe learning environment, Resp. at 1, it has nevertheless opened up meeting facilities for the purpose of hearings that even its employees admit "may get heated," Hr'g Tr. Nov. 22, Vol. 2B, at 296:24–297:9. Of course, that these meetings might become heated does not in any way excuse Kugler's recent conduct, which has reached so severe a level that it has intimidated other participants and prevented meetings from continuing.

Still, the Court is persuaded that Kugler has a greater than negligible chance of succeeding in demonstrating that the Board's broad and indefinite restriction on his access to CPS property as a CTU representative is unreasonable. First, banning Kugler from attending such meetings for life without any established recourse is effectively a ban on any First Amendment activity, disruptive or not, that he might engage in as an in-person CTU representative. While the Board's action need not be narrowly tailored to its interests in education and safety, the Court concludes that indefinitely banning Kugler from engaging in any expressive activity on CPS property—while having permitted him to access CPS property since 2010, and

continuing to permit such activity by other CTU representatives—is unreasonable. *Huminski v. Corsones*, 396 F.3d 53, 92 (2d Cir. 2005) (holding that a notice "singling out [plaintiff] for exclusion, thereby permitting all others to engage in similar activity in and around [a nonpublic forum]," was unreasonable); *Walsh v. Enge*, 154 F. Supp. 3d 1113, 1119, 1128–34 (D. Or. 2015) (concluding that "to prospectively exclude [plaintiff], or any other individual, based on a past incident, or even several past incidents, of disruption" from a limited public forum indefinitely was unreasonable); *cf. Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 575 (1987) (observing that a ban on all First Amendment activity in a nonpublic forum would "obvious[ly]" be unjustified "because no conceivable governmental interest would justify such an absolute prohibition of speech"). The purpose of the grievance process is in part to afford a teacher a spirited union representative. To exclude Kugler as such a representative from the process indefinitely on the basis of a handful of notable instances of misconduct, after having permitted him to carry out his duties for several years, is unreasonable.

Granted, Kugler is free to attend grievance hearings by videoconference or telephone, or meet with teachers off of CPS property. But this is hardly a reasonable alternative. Even though Kugler is not entitled to the "most efficient means" of exercising his First Amendment rights in a nonpublic forum, *Cornelius*, 473 U.S. at 809, the Board has not explained how this alternative "assure[s] equal access to all modes of communication," *Perry*, 460 U.S. at 53. Anyone who has participated in a telephone or videoconference knows the expressive limits of these

means of communication. And there is no evidence in the record that hosting grievance hearings or disciplinary meetings off of CPS property is even possible. In fact, Kugler testified at the evidentiary hearing that his ability to represent teachers has been significantly damaged, even with these alternatives in place. Hr'g Tr., Nov. 21, at 63:3–9, 67:4–68:8. In any case, at least in relation to certain disciplinary meetings, the ban prevents Kugler from participating altogether, because videoconferencing is not yet available. Pl.'s Mot. Supplement Record ¶¶ 5–6, Exs. 1–2.

Second, while the Board was not required to select the most reasonable response to Kugler's actions, it declined to pursue other options—such as requiring a CTU member to accompany Kugler to meetings, and presenting Kugler with a last-chance agreement—and the Court finds this refusal to be unreasonable. The Board attempts to explain away these alternatives by pointing to failed negotiations with the CTU.[8] This lawsuit, however, is between the Board and Kugler. The Board was at liberty to require a CTU representative to accompany Kugler or present him with a last-chance agreement on its own accord. Instead, the Board simply bypassed these options because the CTU would not agree to them. The Court is at a loss to understand why the CTU's refusal matters, when it is the

---

[8] The record is unclear as to whether and when negotiations with regard to the Board's request that the CTU assign someone to accompany Kugler to meetings failed. It does not appear that the CTU wholly objected to doing so, at least with respect to one meeting discussed at the evidentiary hearing. Hr'g Tr., Nov. 22, 2016, Vol. 2B, at 328:10–13.

Board that decides who can access CPS property and it was the Board that unilaterally imposed the restrictions at issue here. To be sure, these options are just two of a large swath of reasonable options the Board might have adopted. But there is no evidence in the record that the Board considered them before issuing the letter.

Finally, while the Board has indicated that it intends to keep the ban in place indefinitely, it also indicated at the evidentiary hearing that there might be some unspecified process by which it would lift the ban. *See* Hr'g Tr., Nov. 22, Vol. 2A, at 278:15–25; 279:14–280:7. It would be one thing for the Board to have imposed the ban permanently and irrevocably without any means of review, and, as indicated above, Kugler has shown some likelihood of demonstrating that such a ban would be unreasonable. But the fact that the Board envisions some process—an unspecified, seemingly arbitrary one, at that—for lifting the ban in the future would indicate that even it believes that a lifetime ban would be unreasonable.

For these reasons, even assuming that the ban is viewpoint neutral, the Court finds that Kugler has a greater than negligible chance of demonstrating that it is unreasonable to bar him indefinitely from attending grievance hearings and disciplinary meetings on CPS property in light of the purposes of such hearings and meetings.

### 2. First Amendment Retaliation Claim

Kugler has likewise demonstrated a greater than negligible chance of succeeding on his First Amendment retaliation claim. To succeed on his First

Amendment retaliation claim, Kugler must establish that: (1) he engaged in activity that is protected by the First Amendment; (2) he suffered a deprivation that would likely deter a person of ordinary firmness from similarly engaging in First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Board's decision to take retaliatory action against him. *Bridges*, 557 F.3d at 546.

The Board offers three main arguments why Kugler's conduct at grievance hearings that gave rise to the restrictions is not protected activity. First, the Board contends that Kugler has no First Amendment right to access CPS property. Resp. at 11. But, regardless of whether this is true, the Board permitted Kugler to access CPS property to participate in the grievance hearings at issue. And even if the Board's restrictions were lawful in light of the nature of the forum at issue (which, as the Court has explained, they are not), this is no defense to a First Amendment retaliation claim. *Bridges*, 557 F.3d at 552 ("'[A]n act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for other reasons, would have been proper.'" (alteration in original) (quoting *Howland v. Kilquist*, 833 F.2d 639, 644 (7th Cir. 1987))). Second, the Board contends that Kugler, in the grievance hearings at issue, spoke as a citizen on a matter of public concern, and thus his speech is unprotected. Resp. at 11–12. The Board draws this argument from the test applicable to public employers' regulation of their employees' speech as articulated in *Connick v. Myers*, 461 U.S.

138 (1983), and *Garcetti v. Ceballos*, 547 U.S. 410 (2006). But Kugler is not a public employee of the Board, rendering *Connick* and *Garcetti* inapposite.

Finally, the Board maintains that Kugler has no right to engage in bullying, abusive, and threatening conduct that intimidates and frightens other participants and irreparably disrupts the ability to hold orderly grievance hearings. Resp. at 15. The Court wholeheartedly agrees. But Kugler's disruptive and unprofessional behavior did not rise to the level of true threats, nor did it amount to fighting words, which are "direct personal insult[s] or [ ] invitation[s] to engage in fisticuffs" that are 'likely to provoke the average person to retaliation, and thereby cause breach of the peace,'" *Texas v. Johnson*, 491 U.S. 397, 409 (1989) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 574 (1942)). The Board has not argued otherwise. Indeed, the Supreme Court has made clear that the government may not bar expressive conduct merely because it finds the idea that the conduct evokes to be "offensive or disagreeable." *Id.* at 414. The fact that certain aspects of Kugler's actions were disruptive and abusive is not of itself sufficient reason to bar him from CPS property altogether and for an indefinite period of time.

The Board appears to frame the restrictions as aimed at targeting only the bullying, abusive components of Kugler's expressive conduct. Indeed, "nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992). But such restrictions must further an important governmental interest unrelated to suppression of free expression and provide limits "no greater than is essential to the

furtherance of that interest." *Johnson*, 491 U.S. at 406–07; *United States v. O'Brien*, 391 U.S. 367, 377 (1968). For these reasons, and without condoning his unprofessional and disruptive behavior, the Court finds that Kugler has some likelihood of successfully demonstrating that he engaged in activity protected by the First Amendment, particularly where the Board has barred him from CPS property entirely and for an indefinite duration.

Kugler has also demonstrated some likelihood of success in proving the remaining two elements of a First Amendment retaliation claim. It is likely that a person of ordinary firmness would be deterred from engaging in protected activity if he or she was banned indefinitely from engaging in any First Amendment activity in the forum again. And there is no dispute that but for Kugler's conduct, the Board would not have put the restrictions in place. Accordingly, in addition to his denial of access claim, Kugler has also demonstrated some likelihood of success on his First Amendment retaliation claim.

## II.    Irreparable Harm and Inadequate Remedy at Law

As noted above, the loss of First Amendment freedoms for even a short amount of time constitutes irreparable harm, and it is difficult to quantify compensatory damages, rendering legal remedies inadequate. *ACLU of Ill.*, 679 F.3d at 590; *Christian Legal Soc'y*, 453 F.3d at 859, 867. The Court sees no reason to depart from these well-settled principles in this case. As explained above, Kugler has been indefinitely barred from exercising any First Amendment right on CPS property. The Board's only argument otherwise is that Kugler can still participate

in grievance hearings off of CPS property and by telephone or videoconference. Resp. at 1. This argument fails for two reasons. First, as Kugler explains in his supplemental brief, he cannot attend certain disciplinary meetings that are expected as part of his job as a CTU representative. Pl.'s Mot. Supplement Record ¶¶ 5–6, Exs. 1–2. The Board responds that such meetings were not the focus of the evidentiary hearing, and explains that it is in the process of arranging videoconferencing for these meetings, Def.'s Resp. Mot. Supplement Record at 4, but neither response changes the fact that, at present, the Board's restrictions prevent Kugler from representing CTU members at disciplinary meetings. And, more importantly, Kugler is barred from expressing himself in-person at grievance hearings for an indefinite period, which has unreasonably harmed him for the reasons explained above. This abridgement of his First Amendment freedoms is irreparable and cannot be compensated by monetary damages.

Accordingly, because Kugler has demonstrated that he has a greater than negligible likelihood of success on the merits, that he will suffer irreparable harm in the absence of a preliminary injunction, and that legal remedies would be inadequate, the Court will proceed to the balancing phase.

## III. Balance of Hardships

In First Amendment cases, "if the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *ACLU of*

*Ill.*, 679 F.3d at 589–90; *see also Christian Legal Soc'y*, 453 F.3d at 867. Here, a statute is not at issue, but the general principle remains the same. As explained above, Kugler has demonstrated that the abridgement of his First Amendment rights constitutes irreparable harm. For its part, the Board maintains that Kugler's conduct impedes the facilitation of grievance hearings and presents a hostile work environment for all those involved. Resp. at 19. While these hardships might merit any range of reasonable restrictions on Kugler's participation in such hearings, they do not support a lifetime ban on any speech he might engage in on CPS property as a CTU representative, for the reasons explained above. *Christian Legal Soc'y*, 453 F.3d at 867 (observing that "if [defendant] is applying [a] policy in a manner that violates [plaintiff's] First Amendment rights . . . then [defendant's] claimed harm is no harm at all."). Thus, Kugler has demonstrated that the balance of hardships weighs in his favor, and that the public interest would be served by imposing a preliminary injunction.

## Conclusion

For the foregoing reasons, Kugler's motion for a preliminary injunction [6] is granted in part and denied in part. The parties are directed to meet and confer and to provide the Court with a proposed order within seven days of this Order consistent with the Court's holding herein.


**IT IS SO ORDERED.**          **ENTERED  8/18/17**

_____
**John Z. Lee**
**United States District Judge**